UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

PHOEBE THOMPSON, DEAN
ECOFF, and MARCIA E. WADE, on
behalf of themselves and all others
similarly situated,

      Plaintiffs-Appellees,

v.

STATE OF COLORADO,

      Defendant-Appellant.

No. 99-1045

UNITED STATES OF AMERICA,

      Intervenor.

---

ORDER
Filed October 9, 2001

---

Before **BRISCOE,** Circuit Judge, **REAVLEY**, Senior Circuit Judge,[*] and
**MURPHY,** Circuit Judge.

---

The court has before it two petitions for rehearing with suggestions for
rehearing *en banc* in *Thompson v. State of Colorado*, No. 99-1045, one by
appellees and one by the United States as intervenor. The panel has unanimously

---

[*]The Honorable Thomas M. Reavley, Senior Judge, United States Court of
Appeals for the Fifth Circuit, sitting by designation.

voted to deny the petitions for rehearing. Nevertheless, on its own motion, the panel hereby amends the opinion filed on August 7, 2001 as follows:      on page 28, "The absence of numerous examples" is changed to read, "The identification of only a few examples"; on page 29, "Without numerous documented occurrences" is changed to read, "Based on the 'minimal evidence of unconstitutional state discrimination'"; and on page 29, after "attempt to combat unconstitutional discrimination.", is inserted, "*Garrett*, 121 S. Ct. at 965-66."

The petitions for rehearing en banc were transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular service on the court requested that the court be polled, the en banc petitions are also denied.

Entered for the Court
PATRICK FISHER, Clerk of Court

by:
    Jeanne Leal
    Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 7 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PHOEBE THOMPSON, DEAN
ECOFF, and MARCIA E. WADE, on
behalf of themselves and all others
similarly situated,

        Plaintiffs-Appellees,

v.

STATE OF COLORADO,

        Defendant-Appellant.

---

UNITED STATES OF AMERICA,

        Intervenor.

No. 99-1045

---

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 96-S-1791)

---

Stephen R. Senn, Peterson & Myers, P.A., Lakeland, Florida; (J. Davis Connor,
Peterson & Myers, P.A., Lakeland, Florida; Robert Antonello, Robert G. Fegers,
Antonello, Fegers & CEA, Winter Haven, Florida; Glen F. Gordon, John A.
Purvis, William R. Gray, Purvis, Gray & Gordon, LLP, Boulder, Colorado, with
him on the briefs), for Plaintiffs-Appellees.

Paul Farley, Special Assistant Attorney General, State of Colorado, (Ken Salazar, Attorney General, State of Colorado, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

Jessica Dunsay Silver, Seth M. Galanter, Attorneys, Civil Rights Division, Department of Justice, Washington, D.C., filed briefs on behalf of the Intervenor.

---

Before **BRISCOE,** Circuit Judge, **REAVLEY**, Senior Circuit Judge,[*] and **MURPHY,** Circuit Judge.

---

**MURPHY**, Circuit Judge.

---

# I. INTRODUCTION

Plaintiffs-Appellees brought a class action suit against Defendant-Appellant State of Colorado ("Colorado"). Plaintiffs claimed that the fee charged by Colorado for handicapped parking placards violated the Americans with Disabilities Act of 1990 ("ADA") and implementing regulations. After stipulating to various facts, both parties moved for summary judgment. In its motion for summary judgment, Colorado argued that Plaintiffs' claims were barred by the Eleventh Amendment. The district court granted Plaintiffs' motion for summary judgment and denied Colorado's motion for summary judgment. Colorado has appealed the district court's decision; jurisdiction to consider

---

[*]The Honorable Thomas M. Reavley, Senior Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

Colorado's appeal arises under 28 U.S.C. § 1291. Because Colorado is entitled to Eleventh Amendment immunity, this court **vacates** the order of the district court granting Plaintiffs' motion for summary judgment and denying Colorado's motion for summary judgment.

## II. FACTS AND PROCEDURAL HISTORY

Under Colorado law, a "person with a disability" may apply for a special license plate or placard. *See* Colo. Rev. Stat. § 42-3-121(2)(a). The license plate and the placard allow the disabled person to park in designated handicap parking spaces. *See id.* § 42-4-1208(3)(a). The special license plates are supplied to the disabled at the same cost as standard license plates. *See id.* § 42-3-121(2)(a)(I). In order to receive a placard, however, a fee must be paid. *See id.* § 42-3-121(2)(d). The fee is not to exceed the actual cost of issuing the placard; at the time of appellate briefing the fee was $2.25. *See id.*

Plaintiffs brought a class action suit against Colorado challenging the imposition of the placard fee. Plaintiffs claimed that the placard fee violated Title II of the ADA and the implementing regulations promulgated by the Department of Justice. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

-3-

The term "public entity" includes "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1). Plaintiffs also relied on 28 C.F.R. § 35.130(f), a regulation promulgated by the Department of Justice for the purpose of implementing Title II of the ADA. *See* 28 C.F.R. § 35.101. Section 35.130(f) provides as follows:

> A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the [ADA] or this part.

Plaintiffs requested two forms of relief in their complaint: (1) a declaration that it is unlawful for Colorado to require payment for the parking placards and a subsequent injunction preventing Colorado from charging these fees in the future, and (2) reimbursement of previous fees paid by Plaintiffs for the placards after passage of the ADA. [1] Colorado was the only defendant named in the complaint.

In its answer, Colorado claimed, *inter alia*, that it was entitled to immunity under the Eleventh Amendment. After stipulating to many relevant facts, both parties moved for summary judgment. Although Plaintiffs' complaint sought both

---

[1] Plaintiffs also requested attorney fees and litigation costs.

-4-

injunctive relief and reimbursement for past fees paid, Plaintiffs' motion for summary judgment was only for declaratory and injunctive relief.

The cross motions for summary judgment were referred to a magistrate judge. The magistrate judge concluded that (1) the placard fee charged by Colorado violated Title II of the ADA and its implementing regulations; (2) Colorado was not entitled to Eleventh Amendment immunity; and (3) Title II of the ADA does not violate the Tenth Amendment. The magistrate judge thus recommended that Plaintiffs' motion for summary judgment be granted, that Colorado's motion for summary judgment be denied, and that a schedule be set for certification of the plaintiff class claiming reimbursement of fees paid to Colorado for placards.

The district court adopted the magistrate judge's recommendations over Colorado's objections. Colorado appealed to this court. After oral argument, this court formally abated the case following the Supreme Court's grant of certiorari in *Florida Department of Corrections v. Dickson*. *See* 528 U.S. 1132 (2000). The *Dickson* case settled, however, and this case was then reactivated. *See Fla. Dep't of Corr. v. Dickson*, 528 U.S. 1184 (2000). This court further delayed deciding this case, however, in order to await the outcome of *Board of Trustees of the University of Alabama v. Garrett* and to allow the parties and the United

States as intervenor to file supplemental briefs; the Supreme Court decided *Garrett* on February 21, 2001. *See* 121 S. Ct. 955 (2001).

## III. DISCUSSION

On appeal, Colorado argues that it is entitled to Eleventh Amendment immunity from Plaintiffs' suit. Under circuit precedent, a defendant's assertion of Eleventh Amendment immunity calls into question the subject matter jurisdiction of the district court. *See Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999), *overruled on other grounds by Garrett*, 121 S. Ct. at 967-68. *But see Idaho v. Coeur d'Alene*, 521 U.S. 261, 267 (1997) (stating that the Eleventh Amendment "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction"); *Cisneros v. Wilson*, 226 F.3d 1113, 1136, 1137 (10th Cir. 2000) (Kelly, J., concurring in part and dissenting in part) (arguing that "[w]ere the Eleventh Amendment truly jurisdictional, a court would not be free to ignore it" and stating that the court should not have reached the Eleventh Amendment issue), *majority holding overruled on other grounds by Garrett*, 121 S. Ct. at 967. Questions regarding jurisdiction must generally be answered before turning to the merits of a case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998) (rejecting the doctrine of hypothetical jurisdiction). The Supreme Court has held that the issue of whether a statute provides for suits against the states may be

-6-

addressed before examining a defendant's claim of Eleventh Amendment immunity. *See Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 778-79 (2000). Colorado, however, concedes that Title II of the ADA contemplates suits by private individuals against the states. Thus, *Vermont Agency* is not applicable to this case and this court must resolve whether Colorado is entitled to Eleventh Amendment immunity before it can address whether Plaintiffs have stated a valid claim under Title II and its implementing regulations.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment has been understood as "evidencing and exemplifying" a concept of sovereign immunity implicit in the Constitution broader than the explicit language of the amendment might suggest. *Coeur d'Alene*, 521 U.S. at 267-68; *see also Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991). Thus, although the explicit language of the Eleventh Amendment applies only to suits in federal court against a state by citizens of another state, immunity has been extended to suits in federal court by citizens against their own state, such as the present suit. *See Garrett*, 121 S. Ct. at 962; *Hans v. Louisiana*, 134 U.S. 1,

15-21 (1890); *cf. Alden v. Maine*, 527 U.S. 706, 754 (1999) (holding that states possess sovereign immunity from federal suits in state courts).

Certain exceptions to Eleventh Amendment immunity have been recognized. A state can waive its Eleventh Amendment immunity and consent to be sued. *See Coeur d'Alene*, 521 U.S. at 267. There has been no suggestion in this case, however, that Colorado consented to suit under Title II of the ADA. In addition, the Court has often found federal jurisdiction in suits against state officials seeking prospective injunctive relief. *See Seminole Tribe v. Florida*, 517 U.S. 44, 73 (1996). These suits are referred to as *Ex parte Young* suits, based on the Supreme Court case first recognizing this exception to Eleventh Amendment immunity. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). Because no state official has been named as a defendant in this suit, however, the *Ex parte Young* exception to Eleventh Amendment immunity is not appropriate.[2]

_____

[2]Plaintiffs have filed a Motion for Leave to Amend to Add Party Defendant, seeking to add Fred Fisher in his capacity as Executive Director of the Colorado Department of Revenue. This motion is obviously an attempt to make prospective injunctive relief possible through an *Ex parte Young* suit. It appears that, if this court were inclined to grant the motion, it would have the power to do so. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 833 (1989) (concluding that appellate courts do have the power to dismiss a dispensable party whose presence spoils statutory diversity jurisdiction); *Balgowan v. New Jersey*, 115 F.3d 214, 216-17 (3d Cir. 1997) (granting motion to amend the complaint to add a state official as a defendant and to include a claim for prospective declaratory and injunctive relief, thus making *Ex parte Young* suit possible). Nevertheless, there are considerations weighing against Plaintiffs' motion.

Allowing Plaintiffs to amend their complaint would substantially alter the

relevant legal issues to be decided in this case. Under the current complaint, the initial question that must be answered by this court is whether Colorado is entitled to Eleventh Amendment immunity. The main consideration in this analysis is whether Congress validly abrogated Colorado's Eleventh Amendment immunity in enacting Title II of the ADA. If Plaintiffs' motion to amend is granted, however, this court could address the district court's award of the prospective injunctive relief requested in Plaintiffs' motion for summary judgment without regard to the Eleventh Amendment immunity question. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). In addition, after Plaintiffs filed their motion to amend, Colorado asserted a challenge to Congress' ability to pass Title II of the ADA pursuant to the Interstate Commerce Clause. If Plaintiffs' motion to amend were granted, fairness would require this court to allow Defendants to press the Commerce Clause argument; more briefing and perhaps additional oral argument would then be necessary to properly evaluate the Commerce Clause issue. Allowing the amendment would wholly alter the complexion of this case.

Furthermore, unlike in *Balgowan*, there has been no reversal of a prior Supreme Court case on which Plaintiffs relied in drafting their complaint. In *Balgowan*, the plaintiffs had brought a claim against the New Jersey Department of Transportation seeking monetary relief for alleged violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201-219 (1978). *See* 115 F.3d at 216. Under Supreme Court precedent at the time the plaintiffs in *Balgowan* filed suit, it appeared that the FLSA was a valid exercise of Congress' Commerce Clause power and that Congress could abrogate Eleventh Amendment immunity through legislation enacted pursuant to the Commerce Clause. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 19-20 (1989); *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 555-56 (1985). In *Seminole Tribe v. Florida*, which was decided after the plaintiffs in *Balgowan* filed suit, the Supreme Court reversed *Union Gas* and held that Congress cannot abrogate Eleventh Amendment immunity by means of its Commerce Clause power. *See* 517 U.S. 44, 66 (1996). Thus, the Third Circuit allowed the plaintiffs to amend their complaint, partly because of the plaintiffs' reliance on *Union Gas*. *See Balgowan*, 115 F.3d at 217. Plaintiffs in this case, however, have identified no similar equitable consideration justifying their eleventh-hour request to amend their complaint.

In *Newman-Green* the Supreme Court emphasized that the power of appellate courts to dismiss a nondiverse party "should be exercised sparingly." 490 U.S. at 837. This admonition applies to Plaintiffs' motion to add a party, which has neither alleged nor shown that denial of the motion results in an advantage lost by the Plaintiffs or disadvantage incurred. For the above-stated

-9-

Under certain circumstances Congress may abrogate a state's Eleventh Amendment immunity. *See Seminole Tribe*, 517 U.S. at 55. First, Congress must "unequivocally express[] its intent to abrogate the immunity." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Congress has clearly expressed its intent to abrogate Eleventh Amendment immunity in the ADA. *See* 42 U.S.C. § 12202. Second, Congress must abrogate Eleventh Amendment immunity pursuant to a "constitutional provision granting Congress the power to abrogate." *Seminole Tribe*, 517 U.S. at 59. After *Seminole Tribe*, only Section Five of the Fourteenth Amendment stands as a recognized source of power by which Congress can abrogate Eleventh Amendment immunity. *See id.* at 59-66 (overruling *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), which held that Congress can abrogate Eleventh Amendment immunity pursuant to the Interstate Commerce Clause). Congress relied on Section Five of the Fourteenth Amendment in enacting the ADA. *See* 42 U.S.C. § 12101(b)(4). The mere recitation by Congress of Section Five as a basis for the ADA does not, however, end the inquiry; it is a function of the judicial branch to determine whether Congress was within its Section Five authority to abrogate the states' Eleventh Amendment

---

reasons, Plaintiffs' Motion for Leave to Amend to Add Party Defendant is **denied**.

-10-

immunity by enacting Title II. *See City of Boerne v. Flores*, 521 U.S. 507, 527-29 (1997); *Marbury v. Madison*, 1 Cranch 137, 176-80 (1803).

Both this court and the Supreme Court have recently considered whether the ADA is a valid abrogation of Eleventh Amendment immunity. In *Martin v. Kansas*, this court considered a former corrections officer's claims against the State of Kansas brought under Title I of the ADA. *See* 190 F.3d at 1123-25, 1129. Title I of the ADA prohibits certain employers, including the states, from "discriminat[ing] against a qualified individual with a disability" in matters related to employment. 42 U.S.C. § 12112(a); *see also* 42 U.S.C. § 12111(2), (5). In *Martin*, this court concluded that "the ADA was a permissible exercise of Congress' Section 5 enforcement powers" and thus validly abrogated Kansas' Eleventh Amendment immunity. 190 F.3d at 1128. It is not entirely clear from the opinion, however, whether the holding that the ADA was a valid abrogation of the states' Eleventh Amendment immunity applied to all suits brought under the ADA or solely to Title I suits such as the one brought in *Martin*. *Compare Martin*, 190 F.3d at 1125-26 (describing ADA in terms of the duties imposed under Title I in matters of employment), *with Johnson v. Oklahoma*, Nos. 99-6322, 99-6427, 2000 WL 1114194, at *1 (10th Cir. Aug. 7, 2000) (unpublished disposition) (suggesting *Martin*'s holding that the ADA validly abrogated the

-11-

states' Eleventh Amendment immunity applied to a claim brought under Title II of the ADA).

This court again considered a claim brought under Title I of the ADA in *Cisneros v. Wilson*. *See* 226 F.3d at 1115. In *Cisneros*, the court considered whether *Martin*'s holding that the ADA abrogated Eleventh Amendment immunity was still good law in light of the Supreme Court's decision in *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000). *See Cisneros*, 226 F.3d at 1118. In *Kimel*, the Supreme Court held that Congress did not validly abrogate the states' Eleventh Amendment immunity in passing the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634. *See* 528 U.S. at 82-83. This court concluded in *Cisneros* that nothing in *Kimel* required the court to "revise the conclusions expressed" in *Martin* and thus confirmed the viability of *Martin*'s conclusion that the ADA validly abrogated the states' Eleventh Amendment immunity. 226 F.3d at 1128. Because both *Cisneros* and *Martin* were Title I cases, however, it was not necessary for the *Cisneros* court to determine whether *Martin* applied to the entire ADA or just Title I.

In *Garrett*, the Supreme Court held that Title I of the ADA was not a valid abrogation of the states' Eleventh Amendment immunity. *See* 121 S. Ct. at 967-68. The Court noted that the legislative record of the ADA did not identify a pattern of unconstitutional discrimination by the states and that even if such a

-12-

record existed "the rights and remedies created by the ADA against the States would raise the same sort of concerns as to congruence and proportionality as were found in *City of Boerne*." *Id.* at 966, 965. The Court, however, explicitly limited its ruling to Title I of the ADA and stated that it was "not disposed to decide [in *Garrett*] the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under § 5 of the Fourteenth Amendment." *Id.* at 960 n.1.

Against this backdrop of cases, this court must determine whether the validity of Congress' attempt through Title II to abrogate the states' Eleventh Amendment immunity is controlled by precedent. *Garrett*, although clearly instrumental in informing this court's analysis, expressly disavows any holding on Title II of the ADA. *See id.* As stated above, it is not clear whether the decision in *Martin* was intended to apply to the entire ADA or only Title I.[3] It is not necessary, however, for this court to resolve that because *Garrett* clarifies that when evaluating a claim under the ADA the abrogation analysis should be conducted on each specific title, not on the statute as a whole. The Supreme Court held in *Garrett* that Title I of the ADA was not a valid abrogation of Eleventh Amendment immunity; it did not render a decision as to the entire ADA.

---

[3] Whatever the scope of *Martin*, clearly *Garrett* now controls claims brought pursuant to Title I.

-13-

*See id*. Thus, even if *Martin* was a holding as to the entire ADA, *Garrett*

demonstrates that it was error to conduct the abrogation analysis at that level of

generality.[4]  *See Currier v. Doran*, 242 F.3d 905, 912 (10th Cir. 2001) (stating

---

[4]While some courts have addressed the Eleventh Amendment question by broadly considering the entire ADA, *see Coolbaugh v. Louisiana*, 136 F.3d 430, 437-38 (5th Cir. 1998), other courts have gone in the opposite direction and considered whether the specific regulation under which the plaintiff makes a claim is a valid abrogation of Eleventh Amendment immunity. *See Neinast v. Texas*, 217 F.3d 275, 280–82 (5th Cir. 2000) (stating that 28 C.F.R. § 35.130(f) exceeds Congress' Section Five power to enforce the Fourteenth Amendment), *cert denied*, 121 S. Ct. 1188 (2001); *Brown v. N.C. Div. of Motor Vehicles*, 166 F.3d 698, 701, 703-04 (4th Cir. 1999) (same), *cert. denied*, 121 S. Ct. 1186 (2001).  This court agrees with the Ninth Circuit in rejecting a specific "piecemeal analysis" of whether each regulation passed pursuant to Title II is a valid abrogation of Eleventh Amendment immunity. *See Dare v. California*, 191 F.3d 1167, 1176 n.7 (9th Cir. 1999), *cert denied*, 121 S. Ct. 1187 (2001); *see also Alsbrook v. City of Maumelle*, 184 F.3d 999, 1010 (8th Cir. 1999) (en banc) (holding that Title II of the ADA is not a valid abrogation of Eleventh Amendment immunity).  The analysis adopted by the Supreme Court in cases such as *Garrett* addresses *Congress'* ability to abrogate Eleventh Amendment immunity by enacting *legislation* pursuant to its power to enforce the Fourteenth Amendment.  The power of various *agencies* to enact *regulations* implementing legislation passed by Congress is an entirely different question, one that is generally approached with deference by the courts. *See Olmstead v. Zimring*, 527 U.S. 581, 597 (1999) ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, its views warrant respect. We need not inquire whether the degree of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), is in order; [i]t is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (quotations and citation omitted)).  In this court's view, it is simply inappropriate to apply the abrogation analysis to agency regulations. Thus, as the Supreme Court did with Title I in *Garrett*, this court will conduct the abrogation analysis by considering Title II in its entirety.

-14-

that a panel is not bound by a prior panel opinion when there is a superseding Supreme Court decision).  Therefore, this court now writes on a clean slate in addressing whether Title II of the ADA is a valid abrogation of the states' Eleventh Amendment immunity.

Whether there has been an abrogation of Eleventh Amendment immunity is generally controlled by the "now familiar principles" for determining whether the statute in question was validly passed pursuant to Section Five of the Fourteenth Amendment.  *Garrett*, 121 S. Ct. at 963.  Section Five gives Congress the power to enforce the guarantees of the Fourteenth Amendment by enacting "appropriate legislation."  U.S. Const. amend. XIV, § 5; *see also Flores*, 521 U.S. at 536.  This power "includes the authority both to remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."  *Kimel*, 528 U.S. at 81.  When Congress has enacted legislation that exceeds the substantive guarantees of the Fourteenth Amendment, however, the legislation must exhibit "congruence and proportionality between the [constitutional] injury to be prevented or remedied and the means adopted to that end."  *Flores*, 521 U.S. at 520.  In conducting the congruent and proportional analysis, courts look to the Congressional record to determine "whether Congress

identified a history and pattern of unconstitutional [conduct] by the States." *Garrett*, 121 S. Ct. at 964.

In determining whether Title II is a valid abrogation of Eleventh Amendment immunity, it is first important to delineate with some care what conduct Title II prohibits or, perhaps more appropriately in this case, what conduct Title II requires. Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity    ." 42 U.S.C. § 12132.

A cursory reading of the statutory language can leave the impression that Title II simply prohibits intentional exclusion against the disabled solely because of their status as "disabled." A more thorough review, however, reveals that, rather than preventing public entities from treating the disabled differently than the nondisabled, Title II requires that public entities make certain accommodations for the disabled in order to ensure their access to government programs. *See* Bonnie Poitras Tucker, *The ADA's Revolving Door: Inherent Flaws in the Civil Rights Paradigm*, 62 Ohio St. L.J. 335, 344 (2001) (stating that "[s]imple equal treatment does not result in [the disabled's] inclusion into mainstream society" and that "[t]he ADA recognizes this need for different treatment"). That Title II of the ADA requires accommodations by public entities

is evident from other portions of the statute, the regulations implementing Title II, and caselaw interpreting the statute.

The findings section of the ADA (applicable to all titles of the Act) states that

> individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, *the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices*, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities.

42 U.S.C. § 12101(5) (emphasis added). The definition of a "qualified individual with a disability" also illustrates the affirmative duty Title II imposes on public entities:

> The term "qualified individual with a disability" means an individual with a disability who, *with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services*, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

*Id.* § 12131(2) (emphasis added). In addition, Part B of Title II delineates specific examples of what constitutes "discrimination" by public entities in their public transportation services. *See id.* §§ 12141-12165. This section of the statute requires, *inter alia*, that all new public transportation vehicles be accessible to the disabled and that any public entity which operates a fixed route

-17-

transportation system provide comparable services for use by the disabled. *See id.* §§ 12142-12144.

Thus, from the language of the statute it is clear Title II requires public entities to make accommodations for the disabled. The regulations issued by the Department of Justice implementing Title II confirm this reading of the statute. *Cf. Alexander v. Choate*, 469 U.S. 287, 304-05 & n.24 (1985) (using regulations as a source of guidance in interpreting a statute). One regulation provides that

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). The regulation on which Plaintiffs in this case have based their claim also demonstrates that public entities will be required to take certain "measures" in order to comply with Title II. *Id.* § 35.130(f).

Finally, many courts have recognized that Title II requires public entities to make accommodations for the disabled. *See, e.g.*, *Popovich v. Cuyahoga County Court of Common Pleas*, 227 F.3d 627, 638 (6th Cir. 2000) (stating that Title II "imposes an affirmative obligation on public entities to accommodate disabled individuals"), *rehearing en banc granted, opinion vacated* (Dec. 12, 2000); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1009 (8th Cir. 1999) (en banc). Similarly, Section 504 of the Rehabilitation Act of 1973 ("§ 504"), which uses

-18-

language almost identical to Title II in describing a violation by covered entities,[5] has been interpreted to require "reasonable accommodations" to covered programs or services. *See Sch. Bd. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (stating that "reasonable accommodations" by covered entities are required under § 504); *Alexander*, 469 U.S. at 299-301 (assuming without deciding that § 504 provides for at least some disparate impact claims and that "reasonable accommodations . . . may have to be made"); *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 25 (1st Cir. 1991) (en banc). Thus, the duty to accommodate contained in Title II is well settled.

It appears, however, that the duty to accommodate under § 12132 is not boundless. Regulations issued by the Department of Justice speak of "reasonable modifications" that do not "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also* 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" as an individual "who, with or without *reasonable* modifications . . ., meets the essential eligibility requirements for the receipt of services" (emphasis added)). While expressly avoiding any ruling on the validity of § 35.130(b)(7), the Supreme Court has interpreted the regulation to allow inquiry into whether an accommodation is "reasonable" in light of, *inter alia*, "the resources available to the State." *Olmstead v. Zimring*,

---

[5]*Compare* 42 U.S.C. § 12132, *with* 29 U.S.C. § 794(a).

527 U.S. 581, 607, 592, 603-07 (1999). It is not necessary for purposes of this case to determine exactly when a state might refuse an accommodation because it is "unreasonable" or because it "fundamentally alter[s] the nature of the service, program, or activity"; this court will assume that such a defense does exist in certain circumstances.

The next step in determining whether Title II is a valid abrogation of Eleventh Amendment immunity "is to identify with some precision the scope of the constitutional right at issue." *Garrett*, 121 S. Ct. at 963. Section Five of the Fourteenth Amendment gives Congress the power to enforce the provisions of the Fourteenth Amendment. Plaintiffs claim that Title II enforces both the Equal Protection Clause and the Due Process Clause. *See* U.S. Const. amend. XIV, § 1.

The fundamental guarantee of the Equal Protection Clause is that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, a typical claim brought under the Equal Protection Clause challenges a classification or distinction made by the state. The reviewing court then determines the seriousness with which the Equal Protection Clause treats the particular classification and then applies the appropriate degree of judicial scrutiny to the state justifications for making the distinction.

The Supreme Court case of *Cleburne* follows this pattern. In *Cleburne*, the Court considered an Equal Protection challenge to a city ordinance that required a special use permit for construction of a group home for the mentally disabled. *See id.* at 435-37. The Court determined that "mental retardation" is not a quasi-suspect class and that state legislation making classifications based on mental retardation need only be rationally related to a legitimate city interest. *See id.* at 442-46. Thus, a state violates the Equal Protection Clause if it makes distinctions between the disabled and nondisabled without a rational justification.[6] Of course, "a bare [] desire to harm a politically unpopular group" is not a legitimate state interest. *See United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). When a state acts with invidious intent there is an equal protection violation even if no facial distinction has been made and the state action merely has a disparate impact on the disabled. *See Lee v. City of L.A.*, 250 F.3d 668, 686-88 (9th Cir. 2001); *Erickson v. Bd. of Governors of State Colls. & Univs. for Northeastern Ill. Univ.*, 207 F.3d 945, 950 (7th Cir. 2000).

In contrast to the Equal Protection Clause prohibition on invidious discrimination against the disabled and irrational distinctions between the

---

[6]Although *Cleburne* dealt only with classifications based on mental retardation, the Court's decision in *Garrett* confirms that classifications based on disabilities, whether mental or otherwise, are subject only to rational basis review. *See Bd. of Trustees of the Univ. of Ala. v. Garrett*, 121 S. Ct. 955, 963-65 (2001).

-21-

disabled and the nondisabled, Title II requires public entities to recognize the unique position of the disabled and to make favorable accommodations on their behalf. Thus, while the basic premise of the Equal Protection Clause is that similarly situated citizens should be treated alike, the mandate of the ADA is that those who are not similarly situated should be treated differently. The Equal Protection Clause does not generally require accommodations on behalf of the disabled by the states. *See Garrett*, 121 S. Ct. at 964 ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause."); *Erickson*, 207 F.3d at 951 ("[N]o one believes that the Equal Protection Clause establishes the disparate-impact and mandatory-accommodation rules found in the ADA.").

Plaintiffs correctly note that a fundamental interest in voting inheres in the Equal Protection Clause. *See Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). Thus, state measures which have the effect of denying or diluting a citizen's vote must be justified with a compelling state interest. *See id.* at 670 (striking down state poll tax); *Reynolds v. Sims*, 377 U.S. 533, 568-69 (1964) (establishing the one person-one vote standard). It is not clear whether the equal protection interest in voting requires states to make accommodations for the

disabled in order to ensure their ability to vote.  *See Selph v. Council of L.A.*, 390

F. Supp. 58, 61 (C.D.Cal. 1975) (holding that Equal Protection Clause does not

require city to make polling places accessible to the disabled when absentee

voting is available); *Whalen v. Heimann*, 373 F. Supp. 353, 357 (D. Conn. 1974)

(finding no equal protection violation in failing to provide absentee ballots to

those who are physically unable to vote and stating that "[a] physically

incapacitated voter has no more basis to challenge a voting requirement of

personal appearance than a blind voter can complain that the ballot is not printed

in braille" and that it is not "the province of courts to weigh the relative ease or

difficulty with which the state could accommodate its voting procedures to meet

the needs of various handicapped voters"); *cf. McDonald v. Bd of Election

Comm'rs*, 394 U.S. 802, 806-11 & n.6 (1969) (holding that Illinois did not violate

the Equal Protection Clause by refusing to give unsentenced inmates an absentee

ballot, when there was no record evidence that inmates would be prevented from

voting on election day).  For purposes of this case only, this court assumes

without deciding that the Equal Protection Clause requires states and local entities

either to make polling locations accessible to the disabled or to allow the disabled

to vote by absentee ballot.

Plaintiffs also rely on the Due Process Clause.  The Due Process Clause of

the Fourteenth Amendment has been interpreted to incorporate most of the

guarantees found in the Bill of Rights; these incorporated provisions thus apply to the states as well as the federal government. *See Duncan v. Louisiana*, 391 U.S. 145, 148 (1968). Some of the incorporated guarantees of the first ten amendments require states, on certain occasions, to make accommodations for the disabled. For instance, a prison is required to provide the disabled with accessible toilets in order to comply with the prohibition against cruel and unusual punishment contained in the Eighth Amendment. *See LaFaut v. Smith*, 834 F.2d 389, 389-95 (4th Cir. 1987) (Powell, J., sitting by designation). In at least some instances, the failure of states to provide accessible courtrooms could conceivably be a violation of due process. *See Faretta v. California*, 422 U.S. 806, 819 n.15 (1975) ("[A]n accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."); *Helminski v. Ayerst Labs*., 766 F.2d 208, 215 (6th Cir. 1985) (holding that a civil litigant's "physical condition alone does not warrant his exclusion from the courtroom during any portion of the proceedings"). These examples do not exhaust the categories of rights protected by a requirement for some level of accommodation under the Due Process Clause. *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 309-10, 322 (1982) (holding that mentally disabled individual who had been involuntarily committed to a state institution was entitled by Due Process Clause to "minimally adequate training"). For purposes of this case,

-24-

however, it is sufficient to note that the Due Process Clause does not contain the general mandate found in Title II, which requires accommodations by public entities in all of its "services, programs, or activities." 42 U.S.C. § 12132.

Thus, states can violate the Fourteenth Amendment rights of the disabled in three different ways. First, facial distinctions between the disabled and nondisabled are unconstitutional unless rationally related to a legitimate state interest. Second, invidious state action against the disabled is unconstitutional, even if facially neutral toward the disabled (such as neutral statutory language). Finally, in certain limited circumstances such as those involving voting rights and prison conditions, states are required to make at least some accommodations for the disabled.

Having explored the Fourteenth Amendment's protections of the disabled, this court next "examine[s] whether Congress identified a history and pattern of unconstitutional [conduct] by the States against the disabled." *Garrett*, 121 S. Ct. at 964. In conducting this inquiry, only constitutional violations committed by beneficiaries of the Eleventh Amendment are considered.[7] *See id.* at 965.

---

[7]Of course, whether a particular defendant is entitled to Eleventh Amendment immunity is not always a straightforward question. *See, e.g., Ambus v. Granite Bd. of Educ.*, 995 F.2d 992, 995-97 (10th Cir. 1993) (en banc) (applying four-part test to determine if local school districts are entitled to Eleventh Amendment immunity). As a result of the directive in *Garrett* that only congressional findings of constitutional violations by beneficiaries of the Eleventh Amendment be considered, a determination that a statute is not a valid

Congress held thirteen hearings and created a special task force to assess the need for the ADA. *See Garrett*, 121 S. Ct. at 969-70 (Breyer, J., dissenting). As a result of these inquiries, Congress determined that "discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." 42 U.S.C. § 12101(a)(3). Clearly, many of the "critical areas" in which Congress determined "discrimination" to exist apply to the states and come under the purview of Title II. Normally, congressional findings are entitled to much deference. *See Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985). As explained above, however, Congress' determination of what constitutes "discrimination" against the disabled differs from discrimination in the constitutional sense. *See, e.g.*, 42 U.S.C. § 12101(5). This court's duty is therefore to determine "whether Congress identified a history and pattern of *unconstitutional* [] *discrimination* by the States against the disabled." *Garrett*, 121 S. Ct. at 964 (emphasis added).

---

abrogation of Eleventh Amendment immunity does not necessarily mean that the statute is not a valid exercise of Congress' power to enforce the Fourteenth Amendment. Because the Fourteenth Amendment applies to local government entities not entitled to Eleventh Amendment immunity, the analysis of whether Congress has the power to enact legislation requires inquiry into constitutional violations by these entities in addition to entities entitled to Eleventh Amendment immunity.

There is some evidence in the congressional record that unconstitutional discrimination against the disabled exists in government "services, programs, or activities." *See, e.g.*, 2 Staff of the House Comm. on Educ. & Labor, 101st Cong., 2d Sess., Legislative History of Public Law 101-336: The Americans with Disabilities Act 1230 (Comm. Print 1990) [hereinafter *Legislative History*] (discussing neighborhood opposition to housing for the mentally disabled); *see also Alexander*, 469 U.S. at 295 n.12 (discussing § 504 of the Rehabilitation Act of 1973 and stating that "well-cataloged instances of invidious discrimination against the handicapped do exist"). However, most of these occurrences involve local officials and not the states.[8] *See, e.g.*, 3 *Legislative History* 1872 (discussing invidious refusal by park commissioner to allow disabled person to swim in public pool). In any event, the vast majority of incidents discussed in the legislative record involving government "services, programs, or activities" are refusals by public entities to make accommodations for the disabled. *See, e.g., Americans With Disabilities Act: Hearings on H.R. 2273 Before the Subcomm. on Surface Transp. of the Comm. on Public Works and Transp.*, 101st Cong. 204-09 (1989) (statement of John Hudson, Social Work Coordinator at the National

---

[8]In fact, by the time Congress enacted the ADA every state in the Union, including Colorado, had enacted legislation requiring some accommodations on behalf of the disabled. *See Garrett*, 121 S. Ct. at 964 n.5; Colo. Rev. Stat. § 9-5-101 to -112.

Rehabilitation Hospital in Washington, D.C.) (discussing lack of adequate public transportation for the disabled in Montgomery County, Maryland). The identification of only a few examples of unconstitutional discrimination against the disabled confirms the notion that Title II's primary focus was the failure by public entities to make accommodations for the disabled. *See Helen L. v. DiDario,* 46 F.3d 325, 335 (3d Cir. 1995) (stating that "the ADA evolved from an attempt to remedy the effects of benign neglect resulting from the invisibility of the disabled" and that "invidious animus . . . was not the focus of . . . the ADA"(quotations omitted)); *see also Americans With Disabilities Act of 1989: Hearing on H.R. 2273 Before the Comm. on the Judiciary & the Subcomm. on Civil & Constitutional Rights of the Comm. on the Judiciary*, 101st Cong. 162 (1989) (statement of Laura D. Cooper, disabled attorney) ("It is my firm belief that many, but not all[,] of the inaccessibility problems that I have encountered are not so much the result of hostility or willful discrimination; rather, they are the result of benign neglect and a lack of understanding or concern about how particular policies or practices affect the disabled patrons in our midst."). The Supreme Court, in discussing § 504 of the Rehabilitation Act of 1973, upon which Title II of the ADA was based,[9] has stated that

---

[9]*See* H.R. Rep. No. 101-485(II), at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303; H.R. Rep. No. 101-485(III), at 49-50 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445.

> [d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect. . . . Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative animus.

*Alexander*, 469 U.S. at 295-96 (footnote omitted). This language is applicable to Title II of the ADA. Apathetic attitudes and refusals to make accommodations do not usually violate the Fourteenth Amendment.

This court cannot conclude that Congress "identified a history and pattern" of unconstitutional discrimination by the states against the disabled.[10] *Garrett*, 121 S. Ct. at 964. Nor can this court find in the caselaw "extensive litigation and discussion of the constitutional violations." *Id.* at 968 (Kennedy, J., concurring). Without this foundation, Title II cannot be considered preventive or remedial legislation that is congruent and proportional to any constitutional violation. Based on the "minimal evidence of unconstitutional state discrimination" against the disabled, Title II's accommodation requirement appears to be an attempt to prescribe a new federal standard for the treatment of the disabled rather than an attempt to combat unconstitutional discrimination. *Garrett*, 121 S. Ct. at 965-66.

---

[10]This court was also unable to identify a history and pattern of unconstitutional state conduct in The Report of the Task Force on the Rights and Empowerment of Americans with Disabilities: From ADA to Empowerment (1990).

In this respect, Title II resembles the Religious Freedom Restoration Act, which the Supreme Court struck down in *Flores*. *See* 521 U.S. at 536; *see also Erickson*, 207 F.3d at 951 ("What the RFRA did for religion, the ADA does for disabilities."). Thus, Title II is not a valid abrogation of the states' Eleventh Amendment immunity.[11]

## IV. CONCLUSION

For the reasons stated above, Colorado is entitled to Eleventh Amendment immunity from Plaintiffs' suit and the district court erred in denying Colorado's motion for summary judgment. We therefore **VACATE** the order of the district court granting summary judgment for Plaintiffs and denying summary judgment for Colorado and **REMAND** with instructions that summary judgment be entered for Colorado.

---

[11]This court expresses no opinion on the constitutional power of Congress to enact Title II of the ADA. Thus, *Ex parte Young* suits seeking prospective injunctive relief and suits against entities not protected by the Eleventh Amendment are not prohibited by this opinion.