# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2345

_____

| | | |
|---|---|---|
| Charlotte Klingler; Charles Wehner; Shelia Brashear, | * * * | |
| Appellees, | * * | |
| United States of America, | * * | |
| Intervenor on Appeal, | * * | On Motion for Reconsideration. |
| v. | * * | |
| Director, Department of Revenue, State of Missouri, | * * * | |
| Appellant. | * | |

_____

Filed: July 7, 2006 (corrected 7/19/06)

_____

Before WOLLMAN, ARNOLD, and MELLOY, Circuit Judges.

_____

ARNOLD, Circuit Judge.

The disabled people who filed this lawsuit have moved for reconsideration of part of our opinion in *Klingler v. Director, Dep't of Revenue*, 433 F.3d 1078 (2006) (*Klingler III*). The plaintiffs contend that our decision that sovereign immunity prohibits the recovery of monetary damages from Missouri must be revisited in light of the Supreme Court's recent decision in *United States v. Georgia*, 126 S. Ct. 877

(2006). In this supplement to our opinion in *Klingler III*, we consider the plaintiffs' argument but conclude that *Georgia* does not alter the outcome of this case.

## I.

In *Klingler III*, we held that Missouri's practice of charging a $2 fee for removable placards that permit users to park in spaces reserved for disabled people violated the Americans with Disabilities Act (ADA) and its related regulation prohibiting discriminatory surcharges, 28 C.F.R. § 35.130(f). We therefore affirmed the injunctive and declaratory relief awarded by the district court[1] against the State of Missouri. *Klingler III*, 433 F.3d at 1082.

In *Klingler III*, we also rejected for the second time the plaintiffs' argument that they were entitled to monetary damages on their ADA claim. *Id.* We had reached the same conclusion in an earlier appeal based on *Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir. 1999) (en banc), which held that Title II of the ADA did not validly abrogate state sovereign immunity. *See Klingler v. Director, Dep't of Revenue*, 281 F.3d 776, 777 (8th Cir. 2002) (per curiam) (*Klingler I*). The plaintiffs urged us to revisit the monetary-damages question in *Klingler III*, after the Supreme Court had decided *Tennessee v. Lane,* 541 U.S. 509 (2004). In *Lane*, the Court held that Title II of the ADA was a valid abrogation of sovereign immunity as applied to claims that disabled people were being denied the fundamental right of access to court proceedings. *Id.* at 531, 533-34. But we declined to revisit the sovereign immunity question in *Klingler III* because another panel of this court had already determined that *Lane* altered *Alsbrook* only in those cases implicating the fundamental right of access to the courts. *Klingler III*, 433 F.3d at 1082 (citing *Bill M. ex rel. William M. v. Nebraska Dep't of Health & Human Servs.*, 408 F.3d 1096, 1100 (8th Cir. 2005),

---

[1]The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri, sitting by consent of the parties. *See* 28 U.S.C. § 636(c); *see also* Fed. R. Civ. P. 73.

*cert. granted, judgment vacated, and case remanded, sub nom.*, *United States v. Nebraska Dep't of Health & Human Servs.*, 126 S. Ct. 1826 (2006)).

After this panel approved the *Klingler III* opinion, but before its official publication, the Supreme Court issued its decision in *Georgia*. In that case, the Court considered the claims of a disabled inmate who alleged that he was denied accommodation during his imprisonment by the state. *Georgia*, 126 S. Ct. at 879. The inmate claimed that the conditions of his incarceration violated not only the ADA, but also his eighth amendment right to be free from cruel and unusual punishment (a right made applicable to the states by the due process clause of the fourteenth amendment). The Supreme Court said that there was no doubt that Congress can abrogate sovereign immunity for conduct that actually violates the fourteenth amendment. *Georgia*, 126 S. Ct. at 881-82. But since the inmate's claims still had to be fleshed out in the district court, the Supreme Court remanded the case "to determine ... *on a claim-by-claim basis*, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* at 882 (emphasis added).

The language in *Georgia* requiring a claim-by-claim determination of whether Congress validly abrogated state sovereign immunity appears inconsistent with the approach we took in *Alsbrook*, 184 F.3d at 1010, which declared that Title II as a whole was not a valid abrogation of sovereign immunity. It also appears inconsistent with *Bill M.*, 408 F.3d at 1100, which read *Lane* to "modif[y]" *Alsbrook*'s holding only in cases involving access to the courts. We further note that the Supreme Court recently vacated *Bill M.* and remanded the case with instructions that it be reconsidered in light of *Georgia*. *United States v. Nebraska Dep't of Health & Human Servs. Finance & Support*, 126 S. Ct. 1826 (2006). Because of these developments,

we are no longer confident that *Alsbrook* or *Bill M*. can serve as reliable bases for resolving the plaintiffs' claims for money damages.

That said, we need not determine how the Court's decision in *Georgia* may affect the holdings in *Alsbrook* or *Bill M*. in order to decide this case. Even though Title II may validly abrogate the states' sovereign immunity in some cases, we do not believe that the present case is one of them. Our reasons are set forth below.

## II.
### A.

At the outset, we must determine whether it is appropriate for us to address the eleventh amendment issue without the benefit of district court proceedings. In *Georgia*, 126 S. Ct. at 879-80, the allegations of misconduct by the state had only reached the pleadings stage. Recognizing that, the Supreme Court remanded the case with the observation that "[o]nce [the] complaint is amended, the lower courts will be best situated to determine, on a claim-by-claim basis," whether the ADA abrogated state sovereign immunity. *Id.* at 881-82. In their submissions to this court, the disabled plaintiffs and the United States, as intervenor, urge us to remand the case back to the district court so that it can make this determination.

We do not see the need for a remand in this case. In *Georgia*, the courts were dealing with a *pro se* litigant who had filed a complaint alleging a wide variety of misconduct, some of which the Supreme Court determined needed to be developed further and some of which it described as frivolous. Because the Supreme Court was unclear about the precise nature of the plaintiff's claims, and because the Eleventh Circuit had already instructed the district court to allow the plaintiff to amend his complaint, it made sense to remand the matter. *Id.* at 880-82.

In this case, however, the record before us is more than sufficient to determine the nature of the disabled plaintiffs' claims. We have the benefit of not only a proper

complaint, but also an extensive record created for summary judgment. We see little need for a remand when the issue before us is a purely legal one, namely, whether the ADA validly abrogated state sovereign immunity with respect to the claims of the type advanced by the plaintiffs.

B.

The eleventh amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States, by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although, by its terms, the amendment does not protect states from lawsuits by their own citizens, the Supreme Court has long held that states enjoy immunity from such actions. *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890). As broad as the immunity that the states have is, it is not unlimited. The Court has recognized that § 5 of the fourteenth amendment allows Congress to abrogate sovereign immunity to enforce that amendment's provisions. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 637 (1999). But the power to enforce constitutional rights does not permit Congress to redefine the substantive protections of the Constitution. *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).

There is no question that, in enacting the ADA and authorizing its attendant regulations, Congress intended to abrogate state sovereign immunity. *See Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363-64 (2001); *Alsbrook*, 184 F.3d at 1005-06. The relevant question here is whether that abrogation is consistent with the scope of the § 5 power. The Supreme Court has come to different conclusions about whether the ADA validly abrogates sovereign immunity. The Court held that states enjoy sovereign immunity from lawsuits seeking money damages that are filed pursuant to Title I of the ADA, which prohibits employment discrimination on the basis of disability. *Garrett*, 531 U.S. at 360. In *Lane*, 541 U.S. at 531, 533-34, the Supreme Court upheld ADA-based suits against states under Title II's requirement of

-5-

access to government programs and services, at least to the extent that such suits implicate the accessibility of judicial services. Most recently, in *Georgia*, 126 S. Ct. at 881, the Supreme Court held that Title II also validly abrogates sovereign immunity for conduct that is in itself unconstitutional.

To comply with the method laid out in *Georgia*, we must begin our analysis by identifying the precise nature of the claims before us. *Id.* at 882. This reflects the Court's approach in *Lane*. "[N]othing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole. Whatever might be said about Title II's other applications, the question presented in this case is . . . whether Congress has the power under § 5 to enforce the constitutional right of access to the courts." *Lane*, 541 U.S. at 530-31 (footnote omitted).

In their briefs before this court, the disabled plaintiffs suggest that their claims implicate several fundamental rights. That is because the removable parking placards at issue here can be used to gain parking access to governmental facilities such as courthouses, polling places, and legislatures. Because these are all locations where citizens may have the occasion to exercise fundamental rights, the plaintiffs urge us to analyze the abrogation issue as one involving the same type of rights at issue in *Lane*.

We do not believe, however, that the claims before us seriously implicate these rights, for several reasons. First, Missouri's *de minimis* charge of $2 per year for a parking placard cannot be considered a significant impairment of the right to access a courthouse or a voting booth. Second, we find it significant that Missouri's placards provide not only access to park at governmental facilities, but also allow holders to use reserved parking spaces at a wide variety of private locations. *See Klingler III*, 433 F.3d at 1081-82. This broad access further mitigates the effect of the fee on the right of access to fundamental government services. Third, the placard fees are but one method by which disabled people may obtain access to governmental facilities.

-6-

Missouri offers, at no additional charge, special license tags that authorize vehicles to use reserved spaces; the tags are provided for vehicles owned by physically disabled persons, operated at least fifty percent of the time by a disabled person, or used primarily to transport disabled members of the vehicle owner's household. *See* Mo. Rev. Stat. § 301.142.7.

For these reasons, we do not view Missouri's placard fee as an impairment on the exercise of fundamental rights such as those at issue in *Lane*. If the fee in question were charged for elevator rides to a courtroom, or for use of a wheelchair ramp at the door of the voting booth, a different result might be required. But we believe that the effect of Missouri's small annual surcharge for removable parking placards is simply too trivial to amount to an impairment of any fundamental right.

That is not to say that the fee has no constitutional implications. As we held in *Klingler III*, the fee is discriminatory. Because non-disabled people are not required to purchase a placard in order to park at public facilities, the fee discriminates against some disabled people who require the use of accessible parking spaces. Unlike the situation in *Lane*, however, this discrimination implicates only the fourteenth amendment's guarantee of equal protection. Disparate treatment based on disability is subject to rational basis review. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985). Under this deferential standard, the state's placard program is constitutional so long as it is "rationally related to a legitimate governmental purpose." *Id.* Although we have already determined that charging disabled people a small fee in exchange for the parking placards violates § 35.130(f), *see Klingler III*, 433 F.3d at 1082, we conclude that it does not violate the Constitution. The state can reasonably collect the fee to pay for the cost of the program, to discourage frivolous applications, and to control against the fraudulent use of disabled parking spaces.

Because the conduct that the plaintiffs allege does not, in itself, violate the constitution, under *Georgia*, 126 S. Ct. at 878, we must determine "whether

Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  We are addressing Congress's ability to enact "prophylactic" legislation designed to deter unconstitutional conduct, and thus there must be "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Boerne*, 521 U.S. at 520.  Courts conduct a three-part inquiry to determine whether Congress met the *Boerne* requirement:  They identify "the constitutional right or rights that Congress sought to enforce" when it enacted the law being reviewed, *Lane*, 541 U.S. at 522, decide whether Congress "identified a history and pattern" unconstitutional conduct by the states, *see Garrett*, 531 U.S. at 368, and, if so, determine whether the abrogation constitutes a proportionate response to the constitutional violation, *see College Sav. Bank*, 527 U.S. at 646.

## C.

### 1.

Our inquiry here is made somewhat more complicated by the fact that we are not just considering Title II's requirement of reasonable accommodation, but also the regulatory prohibition on surcharges.  In applying *Boerne*, should we consider Title II as a whole, or just § 35.130(f)?  Four Circuits have applied *Boerne* to this particular regulation, and they have taken different approaches.  The Fourth Circuit elected to "examine the legality of the specific statute and regulation" at issue,  rather than all of Title II.  *Brown v. North Carolina Div. of Motor Vehicles*, 166 F.3d 698, 705 (4th Cir. 1999).  That court identified three reasons for its narrow approach:  the canon of constitutional avoidance, administrability, and the federalism concerns that a finding of abrogation would raise.  The Fourth Circuit worried about "sweeping validations of abrogation" that could occur if the court looked broadly at an entire title, especially because it is possible that the constitutionality of individual provisions may differ.  The court concluded that its concerns "dictate[d] a searching review of the legal basis for suit."  *Id.* at 703-05.

-8-

The Fifth Circuit adopted a somewhat similar approach in *Neinast v. Texas*, 217 F.3d 275, 280-82 (5th Cir. 2000), *cert. denied.*, 531 U.S. 1190 (2001). In that case, noting that Congress would not have made findings regarding every topic addressed by regulations, the court began by determining whether a statutory provision that authorized the regulations satisfied *Boerne*. *Neinast*, 217 F.3d at 281. The court concluded that if the authorizing statute met the initial inquiry, it should then examine the particular regulation to determine whether it "operates within the remedial compass defined by Congress through valid use of § 5 powers." *Id.*

The Ninth Circuit, however, rejected the focused inquiry favored in *Brown* as insufficiently deferential to Congress's powers to enforce the fourteenth amendment. "In our view," that court said, "a piecemeal analysis of the regulations would unduly constrain Congress's power to construct a statutory scheme addressing discrimination; the federal courts, in effect, would have a line-item veto over legislation directed at intentional or arbitrary discrimination by the states." *Dare v. California*, 191 F.3d 1167, 1176 n.7 (9th Cir. 1999), *cert. denied*, 531 U.S. 1190 (2001). The Tenth Circuit agreed with the broader approach of *Dare* in *Thompson v. Colorado*, 278 F.3d 1020, 1027 n.4 (10th Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002). (We note that the Tenth Circuit recently held that *Thompson*'s conclusion that Title II did not abrogate sovereign immunity "under any context" was no longer good law after the Supreme Court's decisions in *Lane* and *Georgia*. *Guttman v. Khalsa*, 446 F.3d 1027, 1034 (10th Cir. 2006)).

The Supreme Court has not yet had occasion to determine the proper scope of the *Boerne* inquiry when the action challenged by the states is based upon a regulation rather than a statute. *Lane* and *Garrett* suggest, however, that the court is willing to consider more than just a specific statutory provision. For example, in *Lane*, 541 U.S. at 529-33, the court referred to multiple sections of Title II and its regulations in support of its determination that Title II as it applies to cases implicating the right of access to the courts was congruent and proportional, and therefore a valid abrogation

of sovereign immunity. In *Garrett*, 531 U.S. at 372-73, the Court surveyed more than one statutory section of Title I. The Supreme Court specifically limited its analysis in these two cases to the individual Title of the ADA at issue, but the opinions in *Lane* and *Garrett* went beyond the specific statutory sections at issue when applying the *Boerne* principles. Although we find the Fourth Circuit's concerns in *Brown* to be well-founded, the more recent decisions in *Garrett* and *Lane* lead us to believe that the Supreme Court is painting with a broader brush. We therefore conclude that in deciding whether Congress validly abrogated Missouri's sovereign immunity with respect to the claims presented here, we must consider Title II as a whole and not limit our review to § 35.130(f).

2.

The first step in assessing the validity of Congress's purported abrogation of sovereign immunity is "to identify the rights Congress sought to enforce when it enacted Title II." *Lane*, 541 U.S. at 522. The Supreme Court has held that Title II sought to enforce a variety of basic constitutional guarantees, including the fourteenth amendment's prohibition on irrational disability discrimination and some of the rights protected by the due process clause. *Id.* at 522-23; *see also id.* at 540-41 (Rehnquist, C.J., dissenting). Because we have already determined that this case implicates only the equal protection guarantee against irrational discrimination, we need not determine whether Title II sought to enforce rights beyond those described in *Lane*.

Next, we consider whether Congress, when passing Title II of the ADA, "identified a history and pattern" of unconstitutional conduct. *Garrett*, 531 U.S. at 368. Again, *Lane* answered this question by determining that Congress targeted "pervasive unequal treatment in the administration of state services and programs, including systemic deprivations of fundamental rights." *Lane*, 541 U.S. at 524. The court's decision in *Lane* that Title II targeted a pattern of unconstitutional conduct forecloses the need for further inquiry. *See Association for Disabled Ams., Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 958 (11th Cir. 2005).

We ask finally whether the provisions of Title II are "congruent and proportional" to the rights that it seeks to enforce. As we have said, the Supreme Court specified in *Lane*, 541 U.S. at 530-31, that this question should be answered in light of the specific rights implicated by the case before it. We have already determined that the challenge to Missouri's parking placard fee, unlike *Lane*, does not impose any real limitation on due process rights. Our focus is whether Title II is appropriate legislation to enforce the equal protection clause's prohibition on irrational discrimination.

We do not think that the rights and remedies that Title II creates are an appropriate means of enforcement of the equal protection rights of disabled people. Title II requires states to take affirmative steps to ensure that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although the provisions of Title II permit some flexibility by requiring only reasonable efforts at accommodation, *see id.*; 42 U.S.C. § 12131(2), we think that this case provides a good illustration of the true breadth of the ADA's sweep. In exchange for a removable placard that allows disabled people access to reserved parking spaces at numerous government and private businesses, Missouri is prohibited from imposing a reasonable surcharge to cover the costs of its program benefitting the disabled. The small fee that Missouri imposed to help support its effort to provide disabled parking is certainly not unconstitutional. The fact that the ADA's scheme forbids it convinces us that, rather than seeking to enforce the constitution's guarantee against irrational discrimination based on disability, Congress was seeking to redefine the scope of protection offered by the Constitution. *Accord*, *Neinast*, 217 F.3d at 282; *Brown*, 166 F.3d at 707-08. Because "Congress does not enforce a constitutional right by changing what the right is," *Boerne*, 521 U.S. at 519, we hold that Title II did not validly abrogate Missouri's sovereign immunity in the context of these challenges to its surcharge on parking

-11-

placards. *Cf. Keef v. State of Nebraska*, No. S-03-1306, 2006 WL 1651042 (Neb. June 16, 2006).

We have already determined that Missouri's assessment of an annual $2 fee for the use of a removable parking placard violates the ADA and its related regulations. We have granted the plaintiffs' request for declaratory and injunctive relief. Our holding today only prevents the plaintiffs from recovering the $2.00 annual fee they paid since 1990, because as to the category of claims involving rational discrimination based on disability, Title II of the ADA is not an appropriate exercise of Congress's power under § 5 of the fourteenth amendment.

### III.

In this supplement to our opinion in *Klingler III*, we conclude again that the eleventh amendment prevents the plaintiffs from obtaining monetary relief against the State of Missouri. Restating our conclusion in *Klingler III*, 433 F.3d at 1082-83, "we affirm the district court's grant of the plaintiffs' summary judgment motion and its award of declaratory and injunctive relief, and we remand the case to the district court for entry of a judgment consistent" with *Klingler III*, as supplemented here.

_____