Wesley CHASE, Plaintiff,

v.

Alton BASKERVILLE,
et al., Defendants.

Civil Action No. 3:04CV759–HEH.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 2, 2007.

Wesley Chase, State Farm, VA, pro se.

Noelle L. Shaw–Bell, Mark Ralph Davis, Office of the Attorney General, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

HUDSON, District Judge.

Plaintiff, a deaf Virginia state prisoner, filed this civil rights action. Plaintiff asserted that the failure to provide him with an interpreter to assist him in his school work violated his rights under the Due Process Clause of the Fourteenth Amendment, the Eighth Amendment, the Rehabilitation Act, and Title II of the Americans with Disabilities Act (ADA). Plaintiff demands monetary damages and injunctive and declaratory relief. By Memorandum Opinion and Order entered September 12, 2005, the Court dismissed Plaintiff's constitutional claims. The Court determined that the action should proceed solely on the Plaintiff's ADA and Rehabilitation Act claims against Defendants in their official capacities. Thereafter, the Court granted Defendants' motion to stay the action

pending the Supreme Court's decision in *United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006).

The matter is now before the Court on Defendants' motion to dismiss on the grounds that Congress failed to abrogate the States' sovereign immunity for Plaintiff's ADA and Rehabilitation Act claims and that Plaintiff's claims for injunctive relief are moot. The United States has intervened and Defendants have submitted additional briefing. The matter is ripe for disposition.

## I. TITLE II OF THE ADA

The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II, which applies to public services, programs, and activities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. A person with a disability is "qualified" if he or she, "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id.* § 12131(2). Thus, if a person is disabled and otherwise qualified, the state must ensure that the person is not denied the benefits of services, activities, or programs, because of his or her disability.

The United States notes that the remedies provided by Title II are nearly identical to the remedies provided by the Rehabilitation Act. The United States asserts that Virginia's waiver of sovereign immuni-

ty for Rehabilitation Act claims is firmly established. *See Constantine v. Rectors and Visitors of George Mason Univ.,* 411 F.3d 474, 479 (4th Cir.2005). Therefore, the United States suggests that the principle of constitutional avoidance dictates that the Court prune away Plaintiffs Title II claims and avoid the complicated issue of sovereign immunity. The Court disagrees. As the Third Circuit recently remarked in rejecting an identical argument, "we do not believe that prudence in the form of constitutional avoidance warrants abrogating [Plaintiff's] right to bring a claim under Title II." *Bowers v. NCAA,* 475 F.3d 524, 550 (3d Cir.2007).

## II. ABROGATION OF SOVEREIGN IMMUNITY

■ Although Congress may abrogate the States' Eleventh Amendment immunity, it may do so "only by stating unequivocally its desire to do so and only pursuant to a valid exercise of constitutional authority." *Constantine v. Rectors and Visitors of George Mason Univ.,* 411 F.3d 474, 484 (4th Cir.2005) (*citing Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). Congress unequivocally stated its desire to abrogate the States' Eleventh Amendment immunity in passing Title II of the ADA. *See Tennessee v. Lane,* 541 U.S. 509, 518, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004). Thus, the only question "is whether Congress had the power to give effect to its intent." *Id.*

■ In this instance, the question can be answered in the affirmative only if the enactment of Title II represents a valid exercise of authority under § 5 of the Fourteenth Amendment. *Id.* "Section 5 of the Fourteenth Amendment authorizes Congress to enact 'appropriate legislation' to *enforce*" the substantive guarantees of the Fourteenth Amendment. *Constan-*

*tine,* 411 F.3d at 484 (emphasis added). In this regard, the Supreme Court has concluded that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 882, 163 L.Ed.2d 650 (2006). This Court must answer the question of the validity of Title II's prophylactic reach that was avoided in *Georgia:* whether, in the context of state prisons, Congress's purported abrogation of sovereign immunity under Title II is valid for conduct that does not violate the Constitution.

▮▮▮ Contrary to Defendants' assertion, Plaintiff's failure to plead a constitutional violation does not end the sovereign immunity inquiry. Pursuant to § 5, Congress may "enact prophylactic legislation prohibiting conduct that is 'not itself unconstitutional,' [however] it may not substantively redefine Fourteenth Amendment protections." *Constantine,* 411 F.3d at 484 (*quoting City of Boerne v. Flores,* 521 U.S. 507, 519, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Thus, because the conduct that Plaintiff alleges "does not, in itself, violate the constitution, under *Georgia,* 126 S.Ct. at 878, we must determine 'whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless [a] valid' " exercise of its prophylactic enforcement powers under § 5 of the Fourteenth Amendment. *Klingler v. Director, Dep't of Revenue, Mo.* 455 F.3d 888, 894 (8th Cir.2006). The Court must employ *City of Boerne* congruence and proportionality in making that determination (hereinafter "the *City of Boerne* test").

▮▮▮ In assessing Title II under the *City of Boerne* test, the Court proceeds in three steps: (1) "to identify the constitutional right or rights that Congress sought to enforce when it enacted Title II," *Lane,* 541 U.S. at 522, 124 S.Ct. 1978 (*citing Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)); (2) to determine "whether Congress enacted Title II in response to a pattern of unconstitutional disability discrimination," *Constantine,* 411 F.3d at 485 (*citing Lane,* 541 U.S. at 522–28, 124 S.Ct. 1978); and, (3) to determine whether the rights and remedies created by Title II are "congruent and proportional to the constitutional rights it purports to enforce and the record of constitutional violations adduced by Congress." *Lane,* 541 U.S. at 548, 124 S.Ct. 1978 (Rehnquist, C.J., dissenting) (*citing Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 737–39, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003); *Garrett,* 531 U.S. at 372–73, 121 S.Ct. 955)). As explained below, the pivotal inquiry here is the third step of the *City of Boerne* test.

## III. APPLICATION OF THE *CITY OF BOERNE* TEST

### A. Step One: The Constitutional Rights at Issue

▮▮▮ Under the first step of the *City of Boerne* test, this Court must "identify with some precision the scope of the constitutional right[s] at issue." *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). In the prison context, Title II clearly implicates the Eighth Amendment and the equal protection rights of the Fourteenth Amendment. Specifically, Title II seeks to curb arbitrary or irrational exclusion of disabled inmates from the services, programs, or benefits provided by the state and to prevent cruel and unusual punishment flowing from the denial of adequate facilities or services to disabled inmates. *See United States v. Georgia,* 546 U.S. 151, 126 S.Ct. 877, 882, 163 L.Ed.2d 650 (2006); *see also Tennessee v. Lane,* 541 U.S. 509,

525 n. 11, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); *Miller v. King,* 384 F.3d 1248, 1272 (11th Cir.2004), *opinion vacated and superseded by* 449 F.3d 1149 (11th Cir.2006). Additionally, Title II implicates a "constellation of rights applicable in the prison context," *Georgia,* 126 S.Ct. at 884 (Stevens, J. concurring), including the due process guarantees of the Fourteenth Amendment and the First Amendment rights to the free exercise of religion and free speech.

### B. Step Two: Has Congress Identified a History and Pattern of Unconstitutional Conduct?

■ Under the second step, "we consider whether Title II represents a legislative response to a pattern of unconstitutional disability discrimination in public 'services, programs, or activities generally.'" *Constantine v. Rectors and Visitors of George Mason Univ.,* 411 F.3d 474, 487 (4th Cir. 2005). The Fourth Circuit has interpreted *Lane* as conclusively establishing that Title II as a whole survives the historical inquiry under the second step of the *City of Boerne* test. *Id.* (*citing Miller,* 384 F.3d at 1271 n. 25; *Cochran v. Pinchak,* 401 F.3d 184, 191 (3d Cir.), *rehearing granted and judgment vacated by* 412 F.3d 500 (3d Cir.2005)). Thus, the second step of the *City of Boerne* test is satisfied.

### C. Step Three: Is Title II a Congruent and Proportional Response in the Context of State Prisons?

■ Under the third step, the Court must determine whether Title II is an appropriately tailored response in light of its object of enforcing the First, Eighth, and Fourteenth Amendment rights identified under step one and the history and pattern of unequal treatment identified under step two. *See Lane,* 541 U.S. at 530–33, 124 S.Ct. 1978; *Klingler v. Dir., Dep't of Revenue, Mo.,* 455 F.3d 888, 896 (8th Cir.2006). In this respect, the Supreme Court has noted "[t]he appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one." *City of Boerne,* 521 U.S. at 530, 117 S.Ct. 2157 (internal citation omitted) (*citing South Carolina v. Katzenbach,* 383 U.S. 301, 308, 334, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)).

Some courts have concluded that, under the third step, "[i]t is necessary to understand the specific constitutional rights and *the history of constitutional violations in the particular area* at issue in order to determine the congruence and proportionality of Title II's measures in that area." *Toledo v. Sanchez,* 454 F.3d 24, 35 (1st Cir.2006) (emphases added), *cert. denied,* —— U.S. ——, 127 S.Ct. 1826, 167 L.Ed.2d 356 (2007); *Miller,* 384 F.3d at 1272 (*citing Lane,* 541 U.S. at 531, 124 S.Ct. 1978). The Fourth Circuit, however, has failed to embrace the notion that in evaluating the congruence and proportionality analysis under step three the court independently reexamines the history of violations in the discrete area under review. *See Constantine,* 411 F.3d at 487–88. Rather, the Fourth Circuit concluded that under the third step, the reviewing court is bound by the Supreme Court's conclusions with regard to Title II as a whole, under the second step. *Id.* at 488 Thus, "the congruence and proportionality of Title II must be measured against a record of unconstitutional discrimination that is 'clear beyond peradventure.'" *Id.* n. 10 (*quoting Lane,* 541 U.S. at 529, 124 S.Ct. 1978).

■ Nevertheless, even when responding to a clear record of unconstitutional discrimination, Congress's authority under § 5 extends only to enforcing, not redefining, constitutional protections. *See*

*City of Boerne*, 521 U.S. at 519, 532, 117 S.Ct. 2157. Thus, Congress's chosen remedy "may not work a 'substantive change in the governing law.'" *Lane*, 541 U.S. at 520, 124 S.Ct. 1978 (*quoting City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157). While "the line between remedial legislation and substantive redefinition is not easy to discern," and Congress is given "wide latitude in determining where it lies. . . . [T]he distinction exists and must be observed." *Id.* (internal quotation marks omitted) (*quoting City of Boerne*, 521 U.S. at 519–20, 117 S.Ct. 2157); *see City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157 ("Congress does not enforce a constitutional right by changing what the right is."). "Regardless of the state of the legislative record," legislation will be viewed as an unauthorized substantive change in constitutional protections where the chosen remedy "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157. Conversely, prophylactic or "[p]reventative measures prohibiting certain types of [state actions] may be appropriate when there is reason to believe that many of the [state actions] affected by the Congressional enactment have a significant likelihood of being unconstitutional." *City of Boerne*, 521 U.S.

at 532, 117 S.Ct. 2157 (*citing City of Rome v. United States*, 446 U.S. 156, 177, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980)); *see Lane*, 541 U.S. at 550, 124 S.Ct. 1978 (Rehnquist, C.J., dissenting) (*quoting City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157).[1]

Although the United States asserts that Title II implicates "a constellation of rights applicable in the prison context," *Georgia*, 126 S.Ct. at 884 (Stevens, J. concurring), including the Eighth Amendment, the due process guarantees of the Fourteenth Amendment, and the First Amendment rights to the free exercise of religion, and free speech, it offers little persuasive support for the proposition that Title II's comprehensive remedial scheme is an appropriately calibrated enforcement mechanism for those rights and the policy of judicial restraint in the prison context.[2] As explained below, in the prison setting (1) Title II's goal of accessibility and accommodation is generally not congruent with the rights it implicates, and (2) Title II's indiscriminate demand for accommodation and accessibility on pain of money damages is wildly disproportionate to enforcing any constitutional rights.

**1. The Free Exercise and Due Process Clause**

Admittedly, there is some congruency between an inmate's right to the free ex-

---

1. For example, in *Lane*, the Court concluded that, "Title II's requirement of program accessibility, is congruent and proportional to its object of enforcing the right of access to the courts." 541 U.S. at 531, 124 S.Ct. 1978. In support of this conclusion the Court noted that the "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, [therefore] Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility." *Id.* (*citing* 42 U.S.C. § 12131(2)). The Court reasoned that the new obligations imposed by Title II were "perfectly consistent with the

well-established due process principle that, 'within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard' in its courts." *Id.* at 532, 124 S.Ct. 1978 (*citing Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)).

2. In light of *Lane*, this Court assumes that Title II constitutes a valid abrogation of the States' sovereign immunity in the prison context where the issue concerns denial of access to the courts. That issue is not implicated by Plaintiff's claims.

ercise of his religion and Title II's reasonable accommodation requirement and certain due process protections. For example, the lack of a handicap accessible chapel may substantially burden a disabled inmate in the free exercise of his religion. Thus, the imposition of an accessibility requirement is facially congruent and proportional in that context with the inmate's underlying free exercise rights. Nevertheless, the strict liability imposed by the ADA in this context is not entirely congruent with the jurisprudence that "negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause." *Lovelace v. Lee,* 472 F.3d 174, 201 (4th Cir.2006) (*citing Lewis v. Mitchell,* 416 F.Supp.2d 935, 942–44 (S.D.Cal. 2005); *Shaheed v. Winston,* 885 F.Supp. 861, 868 (E.D.Va.1995)).

▮▮▮▮ Additionally, the Due Process Clause affords inmates notice and a meaningful opportunity to be heard in connection with the deprivation of vested good time credits or transfer to a supermax facility or psychiatric facility. *See Wilkinson v. Austin,* 545 U.S. 209, 225–26, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005); *Vitek v. Jones,* 445 U.S. 480, 494–95, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); *Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Thus, where an inmate's disability, such as an inability to hear or speak, precludes a meaningful opportunity to be heard without accommodation, Title II's accommodation requirement is facially congruent with the underlying due process right. *See Bonner v. Arizona,* 714 F.Supp. 420, 425 (D.Ariz. 1989) (concluding that the Due Process Clause entitled deaf, mute, and vision impaired inmate to an interpreter at disci-

plinary hearing); 28 C.F.R. §§ 35.160–164 (requiring accommodations for the communication impaired inmates). Nevertheless, Title II's accommodation requirement applies to almost every interaction between inmates and prison officials and imposes monetary liability upon the States for a host of actions in operating its prisons that are far removed from the Free Exercise Clause and the infrequent hearings where the Due Process Clause applies. *See, e.g., Chisolm v. McManimon,* 275 F.3d 315, 319 326–30 (3d Cir.2001). Thus, it is incumbent upon the United States to demonstrate that Title II is an appropriate enforcement mechanism for the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment.[3] This, the United States fails to do.

### 2. The Eighth Amendment

▮▮▮▮ The "robust, positive due-process obligation of the States to provide meaningful and expansive court access" in *Lane,* "is in stark contrast with the States' ... negative obligation to abstain from 'cruel and unusual punishment.'" *Miller,* 384 F.3d at 1274 (concluding that Title II of the ADA, as applied in the Eighth-Amendment context to state prisons, fails to meet the requirement of proportionality and congruence). Moreover, Title II's remedy of program accessibility bears little relation to the Eighth Amendment because "[t]he Eighth Amendment has no effect on most prison services, programs, and activities." *Id.* To the extent that the United States suggests that Title II enforces the Eighth Amendment's guarantees pertaining to an inmate's conditions of confinement, it essentially rewrites the Amendment. The Supreme Court has emphasized that "[b]ecause routine discom-

---

3. Although the United States asserts that Title II seeks to enforce the First Amendment right to free speech in prisons, the United States fails to explain and it is difficult to discern how Title II appropriately enforces free speech rights in the prison context. *See infra* Sec. IV.C.4.

fort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citation and quotation marks omitted) (*quoting Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). By contrast, Title II could impose monetary damages upon the States simply if a prisoner was denied services because of disabilities or because the state failed to operate a program in such a manner that "it was readily accessible and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). While Congress may desire that the States make their prison facilities and programs accessible to the disabled, the Eighth Amendment only imposes such an obligation, when the failure to do so would pose "a substantial risk of serious harm" to the disabled inmate. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1995). In short, Title II is not a congruent and proportionate means for enforcing the Eighth Amendment. *See id.* at 833, 114 S.Ct. 1970 (noting that "prison conditions 'may be restrictive and even harsh'" (*quoting Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392)). Moreover, as explained below, Title II fares no better as an enforcement mechanism for the Equal Protection Clause.

### 3. Equal Protection

The Equal Protection Clause does not require States "to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Garrett,* 531 U.S. at 367, 121 S.Ct. 955. Additionally, the burden is upon the complaining party "to negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (internal quotation marks omitted) (*quoting Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). Accordingly, to the extent that "special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause." *Garrett,* 531 U.S. at 368, 121 S.Ct. 955. Thus, the Court in *Garrett* concluded that Title I of the ADA failed step three of the *City of Boerne* test because the demand for reasonable accommodation of the disabled in the area of employment, "far exceeds what is constitutionally required." *Id.* at 372, 121 S.Ct. 955.

The Court's observations regarding the lack of congruence and proportionality with respect to the Equal Protection Clause and Title I apply with equal force to Title II's demands for reasonable accessibility. For example, "whereas it would be entirely rational (and therefore constitutional) for [the] State[s] to conserve scarce financial resources by" selecting for participation in various prison programs and activities those inmates "who are able to use existing facilities," *Garrett,* 531 U.S. at 372, 121 S.Ct. 955, Title II largely prohibits such constitutional conduct. Thus, where none existed under the Equal Protection Clause, "Title II imposes an accommodation obligation on public entities, requiring them to make 'reasonable modifications.'" *Reickenbacker v. Foster,* 274 F.3d 974, 983 (5th Cir.2001), *overruled on other grounds by Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820; *accord, Constantine,* 411 F.3d at 488. Title II's regulations purport to limit this accommodation obligation, for example, by "creating a defense when modifications will 'fundamentally alter the nature of the service, program, or activity,'" *Reickenbacker,* 274 F.3d at 983 (*citing* 28 C.F.R. 35.130(b)(7)),

or "would result in ... undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3). These limitations are hardly indicative of a well-calibrated equal protection remedy, because "[t]he burden of proof on this affirmative defense, of course, lies with the State—creating another disjunction between the remedy and injury that contributes to the failure of Title II in the proportionality and congruence analysis." *Reickenbacker,* 274 F.3d at 983 (*citing Garrett,* 531 U.S. at 372, 121 S.Ct. 955)). In short, Title II imposes an affirmative accommodation obligation in the administration of state prisons that far exceeds what the Equal Protection Clause requires. *See Cochran v. Pinchak,* 401 F.3d 184, 192–93 (3d Cir.2005), *rehearing granted and judgment vacated by* 412 F.3d 500 (3d Cir.2005)[4]; *Wessel v. Glendening,* 306 F.3d 203, 214 (4th Cir.2003), ("Title II thus requires far more than does the Constitution.") *overruled on other grounds by Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820.

This Court recognizes that the Fourth Circuit has concluded that Title II is an appropriate enforcement mechanism for equal protection rights in the context of public higher education. *Constantine,* 411 F.3d at 490 (*citing Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.,* 405 F.3d 954, 959 (11th Cir.2005)). In reaching that conclusion, the Fourth Circuit downplayed the States' sovereign interest of conserving scarce financial resources in the area of higher education and "in achieving its goals as effectively and as efficiently as possible." *Constantine,* 411 F.3d at 489–90 (internal quotation marks omitted) (*quoting Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). The Court then concluded "it is more likely that disability discrimination in the context of a State's operation of public education programs will be unconstitutional than discrimination in the context of public employment." *Constantine,* 411 F.3d at 490.

■■■■■ The decision in *Constantine* does not dictate the result in this case because the significant judicial deference accorded the States in operating their prisons far outstrips the deference owed to the States in administering higher education, or even when the States act as an employer. *See Woodford v. Ngo,* —— U.S. ——, 126 S.Ct. 2378, 2388, 165 L.Ed.2d 368 (2006) ("[I]t is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" (*quoting Preiser v. Rodriguez,* 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973))). "Principles of comity and federalism apply with special force in the context of correctional facilities." *Torcasio v. Murray,* 57 F.3d 1340, 1346 (4th Cir.1995) (*citing Preiser,* 411 U.S. at 492, 93 S.Ct. 1827; *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). Therefore, "the management of state prisons is to be left to the states, as free as possible of federal interference." *Torcasio,* 57 F.3d at 1345–46 (*quoting Taylor v. Freeman,* 34 F.3d 266, 268 (4th Cir.1994)); *see also Wilkinson,* 545 U.S. at 228, 125 S.Ct. 2384 (concluding courts must consider State's interest in scarce resources when formulating due process remedies in the prison context). Thus, "a policy of judicial re-

---

**4.** The Third Circuit vacated its original decision pending the decision by the Supreme Court in *Georgia.*

straint" is the norm in prisoner cases. *Turner,* 482 U.S. at 85, 107 S.Ct. 2254. Indeed, even "when a prison regulation impinges on inmates' [fundamental] constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. 2254.

### 4. Title II Is Not Tailored To Remedying Likely Constitutional Violations.

In order to appreciate the indiscriminate breadth of the Title II's accommodation remedy, one need only examine what it demands of the States for an inmate like Plaintiff. For example, with respect to the obligation to accommodate the communication impaired, the pertinent regulations provide that "[a] public entity shall take appropriate steps to ensure that communications with ... participants ... with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a). These steps include furnishing "appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." *Id.* § 35.160(b)(1). The ADA defines "auxiliary aids and services" to include "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments." 42 U.S.C. § 12102(1)(A). The regulations provide that "auxiliary aids and services" include, among other things, "[q]ualified interpreters" and "telecommunications devices for deaf persons (TDD's)." 28 C.F.R. § 35.104(1). Moreover, the Appendix to Regulation § 35.160 states that "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under

§ 35.164." 28 C.F.R. pt. 35, app. A; *see also id.* § 35.160(b)(2).

"Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners 'could be excluded from participation in')" and thus subject the States to liability under Title II. *Penn. Dep't of Corrs. v. Yeskey,* 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998). For example, in the present case, Virginia is potentially liable to Plaintiff under Title II because it failed to provide him with a qualified interpreter to assist him in his educational programs. This lapse violates no constitutional right that is enjoyed by Plaintiff. Similar educational, rehabilitative, and vocational programs are a pervasive part of prison life. Thus, where the States had no constitutional obligation to offer such programs, Title II potentially imposes liability on the States unless they adequately justify the lack of an interpreter or some other device to assist an inmate in enjoying the full benefits of the program. Moreover, even when the State provides the disabled inmate with assistance to understand his programming, it potentially remains liable because it failed to accede to the inmate's choice of assistance and the tendered aid was deemed insufficiently effective. *See Chisolm v. McManimon,* 275 F.3d 315, 327–28 (3d Cir.2001) (*citing* 28 C.F.R. Pt. 35, App. A; 28 C.F.R. § 35.164). Indeed, virtually every interaction between prison officials and disabled inmates potentially exposes the States to liability, regardless of their constitutional import, unless the States promptly provide reasonable accommodation. *Kiman v. N.H. Dep't of Corr.,* 451 F.3d 274, 289–90 (1st Cir.2006); *Chisolm,* 275 F.3d at 327–30. Title II's lack of congruence and proportionality is even more apparent when one examines what it requires of the States with respect

to services and activities. Services that had been offered purely as a matter of grace, such as telephones, computers, cable television, and books, become vehicles for liability unless the States extend their generosity by furnishing disabled inmates interpreters or other aids for participating in these services. *See Chisolm* 275 F.3d at 329–30 (discussing liability of correctional facility for failing to turn on closed captioning on television during one 24–hour period and for failing to provide unlimited access to a TDD).

 Of course, the States' obligations under Title II are limited by the "reasonable modification" principle, which "does not require a public entity to employ any and all means to make auxiliary aids and services accessible to persons with disabilities, but only to make reasonable modifications that would not fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami–Dade County,* 480 F.3d 1072, 1082 –1083 (11th Cir.2007) (internal quotation marks omitted) (*citing Lane,* 541 U.S. at 531–32, 124 S.Ct. 1978.). However, as noted above, placing the burden of proof of such a defense upon the state is not consistent with Constitutional principles. *See Reickenbacker,* 274 F.3d at 983 (*citing Garrett,* 531 U.S. at 372, 121 S.Ct. 955). Moreover, such a defense fails to advance the notion that Title II is a proportionate remedy because it does little to limit Title II liability to arguable or likely constitutional violations. *See Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank,* 527 U.S. 627, 646, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) ("Despite subjecting States to this expansive liability, Congress did nothing to limit the coverage of the Act to cases involving arguable constitutional violations . . . ."); *see also, City of Boerne,* 521 U.S. at 533, 117 S.Ct. 2157 (noting that portions of the Voting Rights Act that prohibited otherwise constitutional conduct were appropri-ately tailored § 5 legislation because they were confined to those regions of the country "where voting discrimination had been most flagrant") (*citing South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)). Indeed, it would appear that the less critical or necessary the service or activity provided by the State, the more difficult it would be for the State to prevail on this defense.

**D. CONCLUSION**

 In the context of state prisons, Title II's prophylactic demand for reasonable accommodation requires far more than does the Constitution. *See Cochran,* 401 F.3d at 193; *Miller,* 384 F.3d at 1275. Title II's demand for modification or accommodation is not tailored to instances when the failure to do so will likely result in an actual constitutional violation. *See City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157 (*citing City of Rome v. United States,* 446 U.S. 156, 177, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980)). Rather, Title II indiscriminately "prohibits far more state conduct and in many more areas of prison administration than conceivably necessary to enforce" any relevant constitutional rights. *Miller,* 384 F.3d at 1274. Thus, in the prison context, Title II fails the third step of the *City of Boerne* test because it "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157; *see Brown v. N.C. Div. of Motor Vehicles,* 166 F.3d 698, 707 (4th Cir.1998). Therefore, in the context of state prisons, Title II validly abrogates state sovereign immunity and "creates a private cause of action for damages against the States" only "for conduct that *actually* violates the Fourteenth Amendment." *Georgia,* 126 S.Ct. at 882. Accordingly, Plaintiff's demand for damages under Title II will be DISMISSED.

## IV. SOVEREIGN IMMUNITY WITH RESPECT TO PLAINTIFF'S REHABILITATION ACT CLAIMS

A state may waive its sovereign immunity "by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs . . . on a State's consent to waive its constitutional immunity." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir.2005) (internal quotation marks omitted) (*quoting Litman v. George Mason Univ.*, 186 F.3d 544, 550 (4th Cir. 1999)). Title 42 Section 2000d–7 provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." The foregoing statute "clearly and unambiguously conditions the receipt of federal funds on a waiver of State sovereign immunity" for Rehabilitation Act claims. *Madison v. Virginia*, 474 F.3d 118, 132 (4th Cir.2006); *see Constantine*, 411 F.3d at 496. Thus, "the VDOC knowingly waived its sovereign immunity from suit under the Rehabilitation Act, when it accepted federal funds." *Bane v. Va. Dep't of Corr.*, 267 F.Supp.2d 514, 528 (W.D.Va.2003).

Nevertheless, citing *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 1306–07, 164 L.Ed.2d 156 (2006), Defendants assert that because Congress could not impose the Rehabilitation Act obligations on the States directly using its other constitutional powers, then it also cannot enact the measure under the Spending Clause. The Fourth Circuit has rejected Defendants' suggestion that *Rumsfeld* overturned the well settled principle that "objectives not thought to be within Article I's enumerated legislative fields, may nevertheless be attained through the use of the spending power and the conditional grant of federal funds." *Madison*, 474 F.3d at 126 (internal quotation marks omitted) (*quoting South Dakota v. Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987); *citing New York v. United States*, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)). The court further concluded that, "[n]othing in the Spending Clause, however, forecloses Congress from placing conditions on federal funds that reach beyond what the Constitution requires." *Madison*, 474 F.3d at 127 (*citing Dole*, 483 U.S. at 205, 107 S.Ct. 2793). Accordingly, Defendants' motion to dismiss Plaintiff's Rehabilitation Act claims will be DENIED.

## V. MOOTNESS

Here, Plaintiff's ADA and Rehabilitation Act claims are predicated upon his denial of an interpreter in conjunction with his educational classes and programs at Powhatan Correctional Center ("PCC"). The only educational program in which Plaintiff has participated at PCC is the Functional Literacy Program. Plaintiff participated in the program from August 26, 2002, to May 2, 2003, and then again on November 10, 2003, through August 30, 2005. Plaintiff was removed from the program on May 2, 2003, and again on August 30, 2005, because he violated the program's prohibition against three unexcused absences. Plaintiff has not sought to reenroll in the Functional Literacy Program or in any other educational classes since his second dismissal from the program on August 30, 2005.

It is well settled that, "[w]hen students challenge the constitutionality of school policies, their claims for declaratory and injunctive relief generally become moot when they graduate." *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir.2003) (*citing Bd. of Sch. Comm'rs of Indianapo-*

lis v. Jacobs, 420 U.S. 128, 129, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092, 1098 (9th Cir.2000); *Stotts v. Cmty. Unit Sch. Dist. No. 1,* 230 F.3d 989, 991 (7th Cir.2000)). Similar mootness concerns arise with respect to a plaintiff's claims for injunctive relief pertaining to the administration of programs or classes when a plaintiff ceases to participate in the programs and does not indicate that he intends to reenroll. *See Linkenhoker v. Weinberger,* 529 F.2d 51, 52 (4th Cir.1975); *see also White Tail Park, Inc. v. Stroube,* 413 F.3d 451, 457–58 (4th Cir.2005). Here, Plaintiff has not been enrolled in any educational program for over a year and a half. Plaintiff does not suggest that his withdrawal from his educational programs was related to the failure to provide an interpreter, nor does he suggest that he intends to reenroll in an educational program. Accordingly, Plaintiff's demands for injunctive relief are moot and will be DISMISSED.

Defendants' motion to dismiss (Docket No. 27) will be GRANTED IN PART AND DENIED IN PART.

An appropriate Order shall accompany this Memorandum Opinion.

### ORDER (Granting In Part And Denying In Part Defendants' Motion To Dismiss)

In accordance with the accompanying Memorandum Opinion, it is ORDERED that the motion to dismiss (Docket No. 27) is GRANTED IN PART AND DENIED IN PART.

The Clerk is DIRECTED to send a copy of the Memorandum Opinion and Order to Plaintiff and counsel of record.

And it is so ORDERED.